IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| TABATHA WHITE, | ) | |
| | ) | |
| Petitioner, | ) | NO. 3:06-0428 |
| | ) | JUDGE HAYNES |
| v. | ) | |
| | ) | |
| JEWEL STEELE, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM

Petitioner, Tabatha White, filed this pro se action under 28 U.S.C. § 2254, seeking to set aside her first degree murder conviction for which she received a life sentence. Petitioner's claim is that the State's proof is constitutionally insufficient to sustain her conviction under Jackson v. Virginia, 443 U.S. 307 (1979) and the Tennessee Court of Criminal Appeals' decision upholding her conviction is contrary to, and an unreasonable application of Jackson. The Court appointed the Federal Public Defender to represent Petitioner.

Before the Court is Petitioner's motion for summary judgment (Docket Entry No. 12), contending that at her trial, the State's proof lacked any evidence that she solicited, encouraged or acted in a common purpose with her co-defendant who actually shot and killed the victim. Petitioner contends that State's proof established only her insistence on repayment of a drug debt from the victim and her presence at the murder scene. Petitioner argues that these fact alone or in combination, are constitutionally insufficient to convict her of first degree murder. In opposition, the Respondent contends that the state courts' decisions on Petitioner's guilt are reasonable applications of federal law. (Docket Entry No. 18).

## A. Findings of Fact[1]

In <u>Tennessee v. Robins</u>, No. M2001-01862-CCA-R3-CD,[2] the Tennessee Court of Criminal Appeals found the underlying facts on Petitioner's conviction that:

> Around 10:00 p.m. on February 29, 2000, Lyntasha Simmons was inside her apartment at Nashville's Parkway Terrace Apartments when she heard gunshots outside. She looked out her door and saw a person lying on the ground. She had just telephoned the police when an onlooker informed her that it was her brother, Eugene Simmons, also known as Michael Roach, who had been shot. Simmons dropped the phone, ran to her brother's side, and waited for the police to arrive. The victim was transported by ambulance to Vanderbilt Hospital where he died the next day. Metro Nashville Police Officer Terrence Graves testified that, at 10:08 p.m., he received a dispatch regarding a shooting at that location. He arrived within a minute, saw that the victim had suffered gunshot wounds, and secured the scene.

> Amelia Patterson testified that she, along with Pamela Johnson, Tara Johnson, and their cousin, Gerald Johnson, was standing on the porch outside of Pamela's apartment on the night of the shooting . Pamela was on her cell phone talking to a person she referred to as "Tab" when she, referring to the victim, said, "[H]ere he go right here." Pamela told Gerald to bring the victim to her porch. Gerald approached the victim, who was walking just a few feet away, and "kind of like shook him up and brought him over to the porch." <u>The victim "was refusing, but he finally came over there," and Pamela put him on the phone to speak with Tab, who wanted to "talk to him about her money." Patterson testified, "All I heard him say was that he was going to give her her money at 11:30." Patterson said the conversation ended, and "I guess they had told her that they was on their way. They was on the Interstate and she had hung up." Pamela informed her that their discussion concerned "ten-dollars ($10.00) worth of white," meaning cocaine.</u>

> \* \* \*

> The victim proceeded to walk away when Pamela again instructed Gerald to bring him back to the porch. The victim protested, explaining that he had to go heat up the bag of food that he was carrying. Pamela responded that he could heat it up at her house and, apparently accepting this offer, he began walking toward her porch.

---

[1]State appellate court opinion findings can constitute factual findings under 28 U.S.C. § 2254(d). <u>Sumner v. Mata</u>, 449 U.S.539, 546-47 (1981).

[2]Petitioner's direct appeal was consolidated with her co-defendant's appeal.

2

Patterson testified that the victim "didn't make it on the porch," however. At this moment, Tab, accompanied by a man, emerged from the parking area and asked, "where her mother-fucking money was." The victim was never given the opportunity to respond to Tab's demand as the man, who was approximately five or six feet away from the victim, pulled a gun from his pocket and shot him. From the witness stand, Patterson identified Tab as the defendant Tabatha White and the gunman as the defendant Leon Robins. Patterson testified that the police attempted to question Pamela Johnson the night of the shooting, but she "wasn't really cooperating" and was "acting like she was hallucinating."

Tara Johnson testified that, in the days preceding the murder, Tabatha White asked her to keep on the lookout for the victim because she had given him "ten-dollars ($10.00) to do something for her." She remembered Pamela Johnson talking to White on her cell phone on the night of the shooting and informing her that the victim was present. She testified that Pamela told Gerald Johnson to bring the victim to her, which he did. The victim spoke with White on the telephone and told her that he would pay her at 11:30. As the victim attempted to leave, Gerald forced him to stay, and Pamela told him to heat his food at her house. Before the victim could enter the house, Tabatha White and a man approached. White said "she wanted her mother-fucking money," and the "dude" shot the victim. Tara heard three gunshots fired and ran into the house. She testified that she did not see either person's face, but recognized the voice as that of Tabatha White, even though she "didn't really know [her] that much."

Pamela Johnson testified that the defendants were at her house "[e]ither one or two days before" the shooting, and Tabatha White gave the victim ten dollars to procure drugs. Although she had known White "[f]or about two or three years," it was her first encounter with Leon Robins. When the victim failed to return with either the drugs or the money, White was "mad" and instructed Johnson to be on the lookout for him. On the night of February 29, Johnson, standing in her doorway, spotted the victim and called White on a cell phone. Johnson then called the victim over and put him on the phone with White. The phone cut off and the victim proceeded to leave. She called White back and had her cousin, Gerald Johnson, bring the victim back to the front of her house. Moments later, Robins shot the victim and White said "something to him about her money." Johnson testified that she thought the defendants were "just going to beat him up or something."

Detective Danny Satterfield of the Metro Police Department testified that, before trial, Pamela Johnson had told him that she was inside her house when the shooting occurred and could not identify the shooter. At Tabatha White's bond hearing, Johnson again stated that she did not witness the shooting and denied making phone calls to White prior to the shooting.

3

Saying that she had been scared, Pamela Johnson admitted to lying to the police on the night of the shooting by telling them both that she did not know who shot the victim and that Tabatha White had not been there, as well as lying at White's bond hearing. According to Johnson, White had called her and said "just keep the cool and ... everything will be all right." At some point, however, Johnson changed her story and identified both defendants from photographic lineups, explaining that she "just had to tell the truth" and her "kids don't need to be having a momma that is getting in trouble for something she didn't do." On cross-examination, it was elicited from Johnson that the police "coerced" her regarding her testimony. However, neither the details of the alleged coercion, nor its alleged effect, was revealed.

Detective Satterfield testified that, during his investigation, he spoke with Amelia Patterson who told him that "she was there and witnessed the shooting incident." On March 9, 2000, he showed her a photographic lineup of suspects from which she identified Robins without any uncertainty as the man who shot the victim. From another photographic lineup, [Patterson] identified Tabatha White as the woman who was with Robins. That same day, Detective Satterfield spoke with Tara Johnson, who also witnessed the shooting, and showed her identical photographic lineups.

Because of the extensive questioning of Tara Johnson's selections from the male and female photographic lineups, we will set out the details of this matter. The record on appeal includes a copy of each, that of the females depicting Tabatha White as photograph number 4 and that of the males depicting Leon Robins as photograph number 6. On the form that corresponds to the male lineup, she identified "Picture No. 4, White, Tabatha" as "somebody she knew," explaining, "This is Tab. Don't know if Tab was there." However, she made no marks on the form corresponding to the female lineup. Thus, the form that was filled out for the male lineup actually refers to the female lineup, and no form was filled out by the witness corresponding to the male lineup.

Victoria Shelton, who lived in the apartment complex where the shooting occurred, testified that, on that night, she was inside her house and overheard Gerald Johnson tell the victim "that he was going to give him something." When the victim explained that he would pay him later that night, Gerald Johnson "kept saying no." "A few seconds, a couple of minutes" later, she heard four gunshots, went outside, and saw the victim on the ground. She saw a white Chevrolet Cavalier leave the parking lot, and she said that a "light-skinned male black" usually drove that particular car.

Harold Overton testified that he lived in Apartment U-166 at the Knollcrest Apartments. On March 3, 2000, Detective Clifford Mann, responding to an anonymous Crime Stoppers tip, visited Overton to question him about Tabatha White, who lived in nearby apartment U-162. [Overton] told Detective Mann that he

4

was familiar with White and her occasional visitor, Leon Robins, whom he identified from a photographic lineup. A few nights earlier, according to his testimony, he witnessed Robins engaging in the following conversation:

> There was [sic] about three or four guys that were talking, and then one guy walked up and he said Leon, man, ... they are looking for you.... And then he said, like, well, I don't give a fuck, you know, there is more than one Leon ... and then he said besides that, they don't know my last name[.]

On cross-examination, Overton testified that he was fifteen to twenty feet away from the conversation and that, although it was dark, the area was well lit by a streetlight.

Dr. Bruce Levy, the Davidson County Medical Examiner, testified that the victim was shot twice. One bullet entered the middle of the forehead and the other entered the back of the left thigh. As to the head wound, Dr. Levy concluded that the barrel of the gun was greater than two feet away when fired. Based on toxicology tests, he testified that the victim was under the influence of cocaine at the time of the incident.

Cody Sims, customer operations manager for Cricket Communications, a cellular telephone company, testified that Pamela Johnson was a customer on February 29, 2000, and that her cell phone number was 615-485-5158. <u>Laurie Turner, a legal affairs coordinator for Powertel, another cellular telephone company, testified that, according to company records, Tabatha White was a customer on February 29, 2000, and, on that day, three consecutive incoming calls were received on her cell phone from Pamela Johnson's 615-485-5158 phone number. The respective times for those three calls were 9:52, 9:53, and 9:58 p.m.</u>

<u>Marion Tucker testified on behalf of Leon Robins that</u>, on the night of February 29, he, apparently, was a witness to the confrontation with the victim, saying, "I seen this female come up [and] assault [the victim] over ten-dollars ($10.00), and I turned around and ran, and that is all I seen." He stated that <u>the woman who said "Where my ten dollars at?" was holding a gun.</u>

Robins' sister, Nicole House, testified that she was with him at their mother's house on the night of the shooting and, when she left "[b]etween 10:15 and 10:30," he was still there. On cross-examination, she testified that, although she had learned at the preliminary hearing the time and date of the murder for which her brother had been charged, she did not inform the police that she had been with him at the time of the killing. Martinique Robins, another sister of the defendant, also testified that, on the night of the murder, he still was at their mother's house when she departed, sometime "close to 10:30." Like her sister, she did not contact the police about her brother's whereabouts on the night and time of the shooting. Robins' mother, JoAnn Hardy, testified that her son was at home when she returned from work shortly after 11:00

5

p.m. on the night of the shooting.

> Tabatha White's mother, Raven White, testified that her daughter was with her at her house at the time of the shooting. On cross-examination, she admitted that at her daughter's bond hearing, she stated that she went to bed around 9:00 p.m. on the night of the shooting. White's father, James White, testified that he usually goes to bed at "7:30 or 8:00" and that, on the night of the shooting, his daughter "was there when I went to bed. She was there when I got up. Other than that, I can't tell you nothing." But, he testified, if she were to have left while he was asleep, the dogs would have awakened "everybody just about in the neighborhood."

2003 WL 1386835 at **1, 2, 3 and 4 (emphasis added).

Petitioner notes that the state record also reflects that during the testimony of prosecution witness Amelia Patterson, the assistant district attorney, had Ms. Patterson view a photograph of the scene and identify on the photograph the location of all of the persons at the time of the shooting. The prosecution made the pertinent notations on the photograph. The photograph was admitted into evidence as State's Exhibit 2. (Docket Entry No. 10, Addendum No. 2, Volume 1, Trial Transcript, p. 46; Docket Entry No. 10, Addendum No. 2, Volume 3, Exhibits, 13th unnumbered page following trial transcript). In that photograph, moving from left to right, Patterson has placed the victim (marked with a "V" in a circle) (id., at 44-45), the co-defendant, Leon Robins (marked with an "LR in a circle) (id. at 45), herself (marked with "AM" in a circle), the location of Pamela Johnson's apartment (marked "PJ") (id. at 44), and Tabatha White (marked with "TW" in a circle). (Id. at 45). According to Exhibit 2 and Patterson's testimony, at time of the shooting, White was the person most removed from the victim and Patterson stood between White and Robins.

From the State's proof, prior to the Petitioner's arrival at the murder scene, Petitioner was on her cell telephone talking to a person about the victim and wanted to "talk to the victim about her money." The testimony of Amelia Patterson, Tara Johnson, and Pamela Johnson establish that the

6

victim had borrowed $10 from Tabatha White to buy cocaine. When the victim did not deliver, White became angry and spoke with the victim on the telephone. The victim promised to pay White by 11:30 p.m. that night. The State's proof on the White-Robins relationship is Harold Overton who testified that they had been seen together and that Robins had been seen "around" White's apartment. (Addendum 2, Volume 1, p. 107). On cross-examination when asked to explain what he meant by Robins being "around" White's apartment, Overton responded. "No, not in front of her [White's] apartment, no. They were going in front of my window." (Docket Entry No. 10, Addendum 2, Volume 1, p. 114).

At the murder scene, White approached the victim and demanded her money. According to Patterson, White asked for her money and then, Robins shot the victim. The Tennessee Court of Criminal Appeals concluded that "a jury could reasonably infer from this evidence that she shared the criminal intent to kill the victim." 2003 WL 1386835, *7 (Tenn.Crim.App. 2003).

## B. Conclusions of Law

Petitioner's viable habeas claims, if timely, are governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court

7

judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id. The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States"as referring to "holdings as opposed to dicta" of its decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time the Petitioner's state-court conviction became final." Id. at 390; accord, Joshua v. DeWitt, 341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's "role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," Williams, 529 U.S. at 409, and a district court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant

8

state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

For the Petitioner's claim the Supreme Court defined the constitutional standard for the sufficiency of evidence to support a criminal conviction. Jackson v. Virginia, 443 U.S. 307 (1979).

> ...[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to `ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, <u>the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt</u>. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. <u>Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution</u>. The criterion thus impinges upon `jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

Id. at 318-19 (emphasis added with footnotes and citations omitted).

If any rational finder of fact would accept the evidence as establishing each essential element of the crime, the Jackson standard of review is satisfied. Id. at 324 (1979). "The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law" because "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." Id. at 317, 319.

9

Circumstantial evidence, if sufficient to establish an element of the offense, satisfies constitutional requirement of due process, Wiley v. Sowders, 669 F.2d 386, 390 (6th Cir. 1982) (per curiam); and such evidence need not remove every reasonable hypothesis except that of guilt. United States v. Vannerson, 786 F.2d 221, 225 (6th Cir. 1986). Hearsay evidence can be used to support a state conviction provided it qualifies as an exception to the hearsay rule. White v. Illinois, 502 U.S. 346, 355-57, 356 n.8 (1992). The standard is whether the hearsay evidence carries sufficient guarantees of trustworthiness. Curro v. United States, 4 F.3d 436, 437 (6th Cir. 1993).

The State's theory of prosecution was that Petitioner was an aider and abettor of Robins, her co-defendant at the murder trial. Robins, 2003 WL 1386835 at *6. Tennessee's aider-and-abettor statute, Tenn. Code Ann. § 39-11-402(2) provides, in pertinent part, "A person is criminally responsible for an offense committed by the conduct of another if: . . . (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense."

The Tennessee Court of Criminal Appeals also explained that "under the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before **and** after the commission of the crime are circumstances from which an individual's participation may be inferred. No particular act need be shown, and the defendant need not have taken a physical part in the crime." Id. at *6 (emphasis added and citations omitted). "Mere encouragement of the principal is sufficient. . . .In order to be guilty of the crime one must intentionally promote or assist in the offense." State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App.1998) (emphasis added).

Petitioner cites the State's lack of proof that she either solicited, directed, encouraged or prompted Robins to murder the victim or assisted him. According to Petitioner, the State's evidence

10

proves only that Petitioner was looking for the victim and upon finding him, demanded repayment of money that she had given him. Petitioner contends that according to State's Exhibit 2, showing the location of the various persons at the murder scene, if Petitioner had encouraged Robins to shoot the victim, Patterson would have heard such a statement, but Patterson did not so testify at trial. Petitioner cites the lack of proof that she threatened the victim with harm and that she directed Robins or anyone else to do so. Petitioner insists that the State's evidence only proves that she was present with Robins at the murder scene. The State did prove that White knew Leon Robins.

At the oral argument in this Court, Respondent's counsel argued that the Petitioner accompanied her co-defendant after the murder, a fact that can support this conviction. To be sure, the Tennessee appellate court does state Tennessee law to that effect, 2003 WL 1386835 at *6, but Respondent does not identify any proof in the state record to support that contention. On this factual issue, the Tennessee appellate court found as follows on the State's proof against Petitioner:

> Taken in the light most favorable to the State, the proof demonstrated that White gave the victim money to purchase drugs for her, the victim apparently absconding with her funds. White was angered and was looking for the victim, instructing others to do the same. She was alerted to the victim's presence by the telephone call from Pamela Johnson, who summoned the victim to the phone because "Tab want[ed] to talk to him about her money." Over the phone, White discussed the debt with the victim. Shortly thereafter, White arrived on the scene, demanding her "mother-fucking money," as her codefendant twice shot the victim. A jury could reasonably infer from this evidence that she shared the criminal intent to kill the victim. Accordingly, we conclude that the record supports, under a theory of criminal responsibility, White's conviction for first degree murder.

2003 WL 1386835 at *6. In a word, the Tennessee appellate court did not find that the State proved Petitioner was with her co-defendant after the murder.

The defense proof at trial does reflect that at least one witness, Marion Tucker who was called by the co-defendant Robins described Petitioner as carrying a weapon. The Tennessee

11

appellate interpreted this testimony as proof: " that the woman who said "Where my ten dollars at?" was holding a gun." Id. at *4. Tucker's actual testimony is ambiguous as to whether he was describing Petitioner:

> Q. Now would you explain to the ladies and gentlemen on the jury what you saw when you came out of her [Tucker's Aunt's] apartment that night?
>
> A. I seen, I came out fixing to get ready to go to the bus stop, and I seen this female come up assault [the victim] over ten-dollars ($10.00), and I turned around and ran, and that is all I seen.
>
> Q. Marion, the jurors are having a hard time understanding you, so I need for you to try to speak up and speak a little bit more clearly.
>
> A. Okay, I got you.
>
> Q. Now tell us again what you saw when you came out of your aunt's house?
>
> A. I came out of my auntie['s] house. I was about ready to go to the bus stop. I seen this female assaulting [the victim] and I turned around and ran.
>
> Q. Now did you hear the female say something to [the victim]?
>
> A. Yeah.
>
> Q. What was said?
>
> A. Where my ten-dollars ($10.00) at?
>
> Q. Where is my ten-dollars ($10.00) at?
>
> A. Yeah.
>
> Q. Is that what drew your attention to these two people?
>
> A. When I came out, yes, sir.
>
> Q. Okay. Now about how far away were you from them?
>
> A. I wasn't that far. I know that. About 20 feet, 20 yards.

12

Q. Does 134, Apartment 134 face Apartment 164?

A. Close to it.

Q. Close to it?

A. Yeah.

Q. Do they share a common yard?

A. No, it goes the other way.

Q. The other way?

A. Yeah.

Q. Okay. Did you see anybody else out there, Marion?

A. <u>No. There was a whole bunch of folks out there, but who I see with the gun in her hand was a female.</u>

Q. <u>You don't know who that was; do you?</u>

A. <u>I ain't never seen her a day of my life.</u>

* * *

[On Cross-Examination]

Q. Mr. Tucker, where were you when you first saw the incident that was going on?

A. Over my auntie's house.

Q. On the porch of your aunt's house?

A. On the porch?

Q. Yes.

A. Yes, sir.

Q. <u>On the porch. Is that where you were when you saw the shooting?</u>

13

| | | |
|---|---|---|
| A. | Yes, sir. | |
| Q. | All right. And you say that is about 20 feet away? | |
| A. | Yes, sir. | |

\* \* \*

| | |
|---|---|
| Q. | And from where your porch was located to where this incident happened, you were able to see a gun in somebody's hand? |
| A. | I know it was a gun. |
| Q. | Well, did you see a gun in somebody's hand? |
| A. | Yes. |
| Q. | Okay. What color was it? |
| A. | I can't remember all that in my mind. It was dark at the time. |
| Q. | All right, it was dark, wasn't it? |
| A. | Yes, sir. |

(Docket Entry No. 10, Addendum No. 2 at pp. 258-261) (emphasis added).

The Tennessee appellate court did not address a time span for this murder, but its findings of fact reveal that in all likelihood, Petitioner lacked the time to hand a gun to her co-defendant, Leon Robins. As the Tennessee appellate court found:

> Patterson testified that the victim "didn't make it on the porch," however. <u>At this moment</u>, Tab[atha] accompanied by a man, emerged from the parking area and asked, "where her mother-fucking money was." <u>The victim was never given the opportunity to respond to Tab[atha]'s demand as the man, who was approximately five or six feet away from the victim, pulled a gun from his pocket and shot him.</u>

White, 2005 WL 2662571 at *1 (emphasis added). According to these findings, this shooting occurred very quickly. Little time expired between the time Petitioner and her co-defendant emerged

14

from the parking lot and before the victim was shot. As found by that court, the victim did not have time to respond to Petitioner's question about her money before Petitioner's co-defendant shot and killed the victim.

Tennessee's aiding and abetting statute requires that Petitioner must "act with intent to promote or assist the commission of the offense." Here the State's proof does not show that White promoted, solicited, directed, aided, or attempted to aid Robins or encouraged Robins to shoot the victim. The only proof is that the Tennessee appellate court finding that Petitioner was demanding her money and at some point at the murder scene, the Petitioner may have held a gun. Yet, this latter proof was from a co-defendant's witness. The jury rejected the co-defendant Robins's proof, including Tucker testimony. Tucker never identified the Petitioner at trial. Any inference that Petitioner shot the victim was disputed by the State's proof that Robins, her co-defendant shot the victim. Upon review of Tucker's testimony, this Court concludes that this proof does not support the state court's inference that Petitioner aided and abetted Robins in the murder.

The Tennessee Court of Criminal Appeals's decision is unreasonable because that court ruled that Petitioner's premeditation can be inferred from "[t]he use of a deadly weapon upon an unarmed victim, a lack of provocation, and an attempt to shoot the victim again after he had been felled by the first shot and rendered helpless." Robins, 2003 WL 1386835 at *5. Yet, the State's proof does not reflect that Petitioner did so. The Tennessee appellate court cited Ball that "[m]ere encouragement of the principal is sufficient... In order to be guilty of the crime one must intentionally promote or assist in the offense." Id. at *6 (quoting Ball, 973 S.W.2d at 293). There is not any proof that Petitioner encouraged her co-defendant to do so. As the trial court stated: "there is no indication that Ms. White directed that force be used or anything that she expected force

15

to be used." Id. at *7.

As to the Tennessee Court of Criminal Appeals's reliance on the legal principle of criminal responsibility, "[u]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before **and** after the commission of the crime are circumstances from which an individual's participation may be inferred. No particular act need be shown, and the defendant need not have taken a physical part in the crime." Id. (emphasis added). As discussed earlier, there was not any proof or finding that Petitioner was with her co-defendant after the murder. For the Ball principle to control, there would have to be proof that Petitioner encouraged Robins or acted intentionally to promote or assist Robins in the killing of the victim. Otherwise, mere presence at the murder scene would be sufficient to convict on first degree murder.

The Tennessee statute defines the crime of criminal responsibility as "[a]cting with intent to promote or assist the commission of the offense." Tennessee Code Ann. § 39-11-402(2) (emphasis added). The State's case lacked any such proof that White acted to promote or assist in the murder. The State's proof was that Petitioner was insistent on collecting her money and to kill the victim eliminates any prospect for recovery of that drug debt.

As to Tennessee court's inferences about the Petitioner's involvement, the Supreme Court has held that stacking of inferences cannot sustain a criminal conviction. Direct Sales, Co. v. United States, 319 U.S. 703, 711 (1943) ("Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal. This, because charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning what, in that case, was called a dragnet to draw in all substantive crimes.") (citations omitted).

These conclusions about the state courts' findings are supported by Sixth Circuit decisions

16

upon which Petitioner relies. In Brown v. Palmer, 441 F.3d 347, 352 (6th Cir. 2006), the Sixth Circuit distinguished between a "reasonable speculation" and constitutionally sufficient evidence to support a criminal conviction. In Brown, the habeas petitioner was present at a gasoline station where a carjacking occurred. Id. at 349. The man who did the carjacking got out of Petitioner's vehicle just prior to taking the victim's vehicle at gunpoint. Id. The victim testified that "[Petitioner] stared at the victims from his car while the gunman fired shots and drove [the victim's] Buick away from the gas station." Id. After the robber sped off, Petitioner tried to drive off, but his tires skidded in the snow and the victim apprehended him. Id. In Brown, for its aiding and abetting theory, the State relied upon the facts that Brown stared at the victims, never pumped gas at the gas station, attempted to flee following the gunshots, and failed to contact the police to retrieve his car. The district court set aside Brown's conviction of armed robbery and carjacking based upon the aiding and abetting theory and the Sixth Circuit affirmed. Id. at 353. In Brown, the Sixth Circuit deemed that proof insufficient to support a conviction despite the "direct evidence" of that petitioner's presence as the scene and staring at the victim. The Sixth Circuit found that "none of this evidence suggests that [Petitioner] assisted or encouraged the gunman in the commission of the armed robbery and carjacking or that [Petitioner] intended for the gunman to commit the offense - both necessary elements for aiding and abetting under Michigan law." Id.

Brown also cited Hopson v. Foltz, 818 F.2d 866, 1987 WL 37432 (6th Cir. May 20, 1987) that presented similar facts:

> In Hopson, the petitioner had been convicted of aiding and abetting first degree murder based on evidence that he and the victim had argued shortly before the victim was killed, that he was present when the victim was killed, and that he may have known that the perpetrator intended to harm the victim. Id. at *2. Despite this evidence, the Hopson court held that the petitioner's 'animus towards the victim[] cannot be

17

> construed as providing encouragement to the principal,' and that the evidence was insufficient to establish beyond a reasonable doubt that he took conscious action to aid in the shooting.

441 F.3d at 352. Brown emphasized that the "Jackson standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Id. at 351. (citing Jackson, 443 U.S. at 324 n.16).

The facts here are also strikingly remarkably similar to those in Hopson in that Petitioner's guilt is based on her demand of the victim for payment and her presence when Robins shot the victim. In Hopson the defendant was aware that the person intended to harm the victim, but even that proof was held insufficient to convict of aiding and abetting. Petitioner notes that in Brown, "being present at the scene of the crime and having a brief relationship with the carjacker are insufficient facts to establish beyond a reasonable doubt that Brown aided and abetted the latter individual." 441 F.3d at 352.

Another example is Fagan v. Washington, 942 F.2d 1155 (7th Cir. 1991), where the habeas petitioner was present during a shooting in which the victim was killed. At the time, the defendant was firing a .22 rifle, but the victim was killed by a .38. The State's theory for conviction was that the defendant acted in "common design" with others. The Seventh Circuit granted the writ and concluded that "[n]o evidence was presented that Fagan shared a common design with whoever shot Green.... There was, then, insufficient evidence of murder under the 'common design' standard of accountability to convict Fagan beyond a reasonable doubt." Id. at 1159.

As to Hopson, the Sixth Circuit stated in Brown that "[t]he above cases are admittedly pre-AEDPA, but their holdings that distinguish reasonable speculation from sufficient evidence are still persuasive in establishing that the state court's application of federal constitutional law as set forth

18

in <u>Jackson</u>, 443 U.S. at 319, 99 S.Ct. 2781, was objectively unreasonable." 441 F.3d at 352. This same principle holds true for <u>Fagan</u>.

For the above stated reasons, this Court concludes that the Tennessee Court of Criminal Appeals decision was an unreasonable application of clearly established federal law in <u>Jackson</u> and that Petitioner's conviction must be set aside.

For these reasons, the Court concludes that the writ should be granted.

**ENTERED** this the ___7th___ day of April, 2008.

WILLIAM J. HAYNES, JR.
United States District Judge